**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KATHY GAIL BENSON, | ) | |
| | ) | CASE NO.    3:13CV00067 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE JACK ZOUHARY |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Kathy Gail Benson ("Benson") challenges the final decision of the Commissioner of Social Security, Carolyn W. Colvin[1] ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## I.  Procedural History

On March 2, 2010, Benson filed an application for POD and DIB, and on December 29, 2010, she filed an application for SSI.  In both applications, Benson alleged a disability onset date of January 30, 2008 and claimed she was disabled due to back and pelvic pain, degenerative

---

[1]  Defendant indicates that Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013; and, that, pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  (Doc. No. 18 at 1.) Plaintiff does not object.

disc disease, arthritis, osteopena in left hip and spine, sciatic nerve pain, gastrointestinal disorder, depression, anxiety, bladder problems, and excessive stomach acid.  (Tr. 163, 213.) Her application was denied both initially and upon reconsideration.

On September 13, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Benson, represented by counsel, and both a medical expert ("ME") and a vocational expert ("VE") testified.  (Tr. 14-52.)  On October 4, 2011, the ALJ found Benson was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 102-111.)  The ALJ's decision became final when the Appeals Council denied further review.          (Tr. 1- 6.)

## II.  Evidence

### Personal and Vocational Evidence

Age 48 at the time of her administrative hearing, Benson is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c) & 416.963(c).  She has a ninth grade education and was licensed as a state-tested nursing assistant.  (Tr. 21.)  She has past relevant work as a home health attendant, cashier, and cleaner.  (Tr. 109.)

### Medical Evidence

#### Physical Impairments

Benson underwent an MRI of the lumbar spine after injuring her back.  This MRI, dated March 27, 2008, revealed left sided herniated nucleus pulposus (HNP) effacing the thecal sac and mildly narrowing the left foraminal entrance with no evidence of neurocompression; L3-L4 left foraminal and extraforaminal HNP displacing the descending left L3 nerve root resulting in mild left foraminal stenosis; and, L5-S1 spondylotic protrusion resulting in mild biforaminal stenosis.[2]  (Tr. 273.)

---

[2]  HNP is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disc is forced through a weakened part of the disc, resulting in back pain and nerve root irritation.  *See* http://www.nlm.nih.gov/medlineplus/ency/imagepages/9700.htm.  Foraminal stenosis of the lumbar spine is a condition whereby either the spinal canal (central stenosis) or one or more of the vertebral foramina (foraminal stenosis) becomes narrowed.  If the narrowing is substantial, it causes compression of the nerves, which can cause lower back pain, leg pain,

Benson thereafter underwent an initial evaluation at the Marion Pain Clinic with Saud Siddiqui, M.D.  (Tr. 299-300.)  She complained of chronic upper and lower back pain radiating down her left leg.  She reported that, when her lower back swells, it pushes against her sciatic nerve, causing "horrible pain."  (Tr. 299.)  She described the pain as constant, sharp, shooting, aching, intense, and spreading in nature.  (Tr. 299.)  She indicated she gets "some relief" with pain medication.  (Tr. 299.)  At the time of the evaluation, she rated her pain as a three on a scale of ten.  (Tr. 300.)  Dr. Siddiqui diagnosed chronic upper and lower back pain with left hip pain with left L5-S1 radiculitis; left sacroilitis and piriformis syndrome; lumbar spondylosis with myelopathy; thoracic degenerative disc disease with spondylosis; and, history of GERD.  (Tr. 300.)  He prescribed Percocet and a trial of transforaminal epidural steroid injections.  (Tr. 300.)

In April and May 2008, Benson underwent a series of epidural steroid injections at L5-S1 and L3-4.  (Tr. 303-304.)  The following month, Benson reported the injections had helped her leg pain "for a couple of days," indicating that "it's not excruciating any more."  (Tr. 298.)  She stated, however, that her back pain was still there.  (Tr. 298.)

In July 2008, Benson went to the emergency room after she fell and hurt her knee and lower back.  (Tr. 356-359.)  X-rays of her lumbosacral spine showed degenerative changes.  (Tr. 360.)  The following month, Benson underwent an MRI of her thoracic spine which showed a shallow left paracentral and proximal foraminal protrusion at T11-12 resulting in mild left proximal foraminal narrowing without nerve compression.  (Tr. 268.)  There was no evidence of any cord compression or central canal stenosis.  (Tr. 268.)  An MRI of Benson's lumbar spine showed trilevel degenerative disc disease and disc displacements at L3-4 and L5-S1, most pronounced at the L3-4 level, where a left foraminal and extraforaminal protrusion abutted the exiting left L3 nerve root.  (Tr. 267.)  A comparison with Benson's March 27, 2008 MRI showed that the descending S1 nerve roots at the L5-S1 level did not appear abutted on the later examination.  (Tr. 267.)

In treatment notes from September 2008 to August 2009, Benson most commonly rated

_____

and numbness.  *See* http://www.medicinenet.com/lumbar_stenosis/article.htm.

3

her pain as either a four or six on a scale of ten.  (Tr. 291-297.)   In June 2009, she reported another fall and complained of right upper rib and thoracic pain.  (Tr. 293.)  On that occasion, she rated her pain a seven out of ten.  (Tr. 293.)  During this time period, she continued to be treated with pain medications, including Percocet and Vicodin.  (Tr. 291-297.)

In January 2010, Benson went to the emergency room with complaints of abdominal pain. (Tr. 349.)  She reported diarrhea, fever, nausea, palpitations, and vomiting.  (Tr. 344, 349.) A CT scan of Benson's abdomen and pelvis showed no major acute findings, although a "few scattered small bowel air-fluid levels are noted which . . . could potentially represent manifestations of gastroenteritis."  (Tr. 425.)  Physical examination revealed no spinal or costovertebral tenderness, full range of motion in her back and all extremities, and normal muscle strength, sensation, and gait.  (Tr. 345, 351.)  Benson was diagnosed with gastroenteritis and discharged in stable condition with prescriptions for Zoftan and Zantac.  (Tr. 344.)

On February 11, 2010, Benson underwent a gastroscopy, which revealed moderate diffuse nodular gastritis throughout her stomach, some hemorrhagic gastritis in the upper part of her stomach, and mild duodenitis.  (Tr. 401.)  She was prescribed Carafate and Zantac.  (Tr. 402.)  In October 2010, Benson presented to Suzanne Schuler, M.D., with complaints of alternating diarrhea and constipation.  (Tr. 482.)  On examination, Dr. Schuler reported mild epigastric tenderness and mild tenderness over the lumbosacral spine.  (Tr. 483.)  She diagnosed generalized abdominal pain, pelvic pain, diarrhea, and neuropathy.  (Tr. 483.)  Benson saw Dr. Schuler again on November 1, 2010, and continued to complain of diarrhea and bloating.  (Tr. 493.)  Dr. Schuler referred her to a gastroenterologist and prescribed a low cholesterol diet.  (Tr. 494.)

In December 2010, Benson returned to the emergency room with complaints of acute exacerbation of her back pain after her grandchildren jumped on her while she was sitting on the floor.  (Tr. 528.)   Physical examination revealed Benson had moderate back pain in her thoracic and lumbar spines with painful, but intact, range of motion and no muscle spasm.  (Tr. 529.) Tederness was noted at T10, T11, T12, L3, L4, and L5.  (Tr. 529.)  X-rays of her pelvis showed mild degenerative changes around the sacroiliac joints and pubic symphysis with no bony

4

fracture or abnormality of the hips.  (Tr. 531.)  Benson was given prescriptions for Vicodin and Medrol and discharged.  (Tr. 528.)

Several weeks later, on January 4, 2011, Benson underwent an MRI of her lumbar spine which showed a combination of degenerative factors contributing to bilateral neural foraminal narrowing at L5-S1, worse on the left than the right, and no central canal stenosis.  (Tr. 533.) There was disc desiccation and mild intervetebral disc space narrowing at L3-4, L4-5, and L5-S1, but no other evidence of neural foraminal narrowing or central canal stenosis.  (Tr. 533.)  No abnormal osseous signal was noted, and there was a normal conus terminating at L1.  (Tr. 533-534.)  An MRI of her pelvis showed no significant acute findings, although it did note tendinopathy of the hamstrings bilaterally without tear.  (Tr. 532.)

### *Mental Impairments*

Benson was treated for her depression and anxiety by psychiatrist Bipin Desai, M.D., from March 1, 2007 to December 9, 2010.[3]  (Tr. 363-375, 448-462, 523-524.)  At her initial psychiatric evaluation, Benson complained of depression, anxiety, low energy, anhedonia, poor concentration, insomnia, panic attacks, irritability, and feelings of worthlessness.  (Tr. 453.)  She described herself as a chronic worrier and admitted to compulsively washing her hands over 20 times a day.  (Tr. 453.)  On examination, Dr. Desai noted that Benson's mood was depressed and anxious, her affect was blunted, and she had a mild tremor of upper extremities.  (Tr. 454.)  Dr. Desai diagnosed major depressive disorder, moderate, recurrent; r/o bi-polar disorder type 2; generalized anxiety disorder ("GAD"); panic disorder; OCD; and, r/o post-traumatic stress disorder.  (Tr. 454.)  She assigned a current Global Assessment of Functioning ("GAF") score of 55, and noted that Benson's highest GAF of the prior year was 65.[4]  (Tr. 454.)  Dr. Desai

---

[3]  Dr. Desai had seen Benson several years previously and diagnosed her with major depressive disorder, r/o bi-polar disorder, generalized anxiety disorder, panic disorder and obsessive compulsive disorder ("OCD").  (Tr. 453.)

[4]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score between 51 - 60

prescribed Cymbalta and Neurontin, and referred Benson to a therapist.  (Tr. 454.)

Subsequent treatment notes indicate Benson's condition fluctuated from visit to visit.[5]  In January and March of 2009, her mood was "mildly anxious" but she reported feeling "pretty good" and sleeping better at night. (Tr. 375, 374.)  In July 2009, however, she was "depressed and anxious" due to situational stressors, including financial pressures and her brother's recent diagnosis with HIV. (Tr. 373.)  Dr. Desai adjusted her medications and advised her to follow up with her therapist. (Tr. 373.)  The following month, Benson reported feeling better and being free of panic attacks. (Tr. 372.)  At her next visit, in October 2009, Benson was depressed, anxious, and tearful, and reported struggling with financial difficulties and chronic back pain. (Tr. 371.)  Dr. Desai prescribed Zoloft and advised her to continue taking Klonopin for her anxiety.  (Tr. 371.)  In November 2009, Benson reported feeling better and experiencing a decrease in her obsessions and compulsions.  (Tr. 370.)

Throughout 2010, Benson experienced a similar pattern.  In January 2010, she reported feeling "pretty good" and indicated her "panic attacks have resolved." (Tr. 369.)  However, on May 3, 2010, she admitted to "vegetative symptoms of depression" and anxiety, and spoke at length about situational stressors, including her financial difficulties and her father's poor health. (Tr. 458.)  Three weeks later, Benson was "feeling better" and her "mood and affect [was] noted to be improved."  (Tr. 457.)  She reported that she was "coping better with stressors" and "free of panic attacks."  (Tr. 457.)  However, in treatment notes from her last documented visit with

---

denotes "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  DSM-IV at 34.  A GAF score between 61 -70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.  It bears noting that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

[5]  The parties do not direct this Court's attention to any psychiatric treatment notes for the time period between her initial evaluation in March 2007, and January 2009.

Dr. Desai on December 9, 2010, Benson was depressed and admitted to low energy, anhedonia, poor concentration, and hypersomia.  (Tr. 524.)  Dr. Desai strongly encouraged her to follow up with her therapist and adjusted her medication.  (Tr. 524.)

### State Agency Physicians

State agency physician Mila Bacalla, M.D., completed a physical residual functional capacity ("RFC") assessment on July 8, 2010.  (Tr. 433- 439.)  She opined Benson could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds; stand and/or walk for a total of 6 hours in an 8 hour workday; sit for a total of 6 hours in an 8 hour workday; unlimited push/pull capacity; frequently climb ramps and stairs; frequently balance, and kneel; occasionally climb ladders, ropes, and scaffolds; and, occasionally stoop, crouch and crawl.  (Tr. 434-436.)

M.E. Paul Gatens, M.D., reviewed Benson's medical records and completed a set of written interrogatories regarding her physical impairments.[6]  (Tr. 544- 552.)  He opined that Benson's physical impairments, combined or separately, did not meet or equal any of the Listed Impairments.  (Tr. 545.)  Dr. Gatens also opined that Benson could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds; stand or walk a total of five hours in an eight hour work day (no more than one hour without interruption); sit a total of seven hours in an eight hour work day (no more than two hours without interruption); frequently reach, handle, finger, feel and push/pull; occasionally operate foot controls (bilaterally); occasionally climb stairs, ramps, ladders and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally operate a motor vehicle; and, tolerate occasional exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and heat, and vibrations.  (Tr. 547-552.)  In addition, Dr. Gatens opined that Benson could shop; travel without a companion for assistance; ambulate without using a wheelchair, walker, 2 canes, or 2 crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard

---

[6]  Dr. Gatens is board certified in physical medicine and rehabilitation. (Tr. 19.)  There is no indication from his interrogatory responses that he considered or evaluated the extent of Benson's mental impairments.

public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and, sort, handle, or use paper/files. (Tr. 552.)

On July 26, 2010, state agency physician Sudhir Dubey, PsyD., examined Benson and completed a Disability Assessment Report regarding her mental impairments.  (Tr. 441- 447.)  At that time, Benson reported anxiety and symptoms consistent with mild depression.  (Tr. 441, 443.)  She stated she had experienced anxiety three out of seven days for the past three months in crowds, in public, and in social settings.  (Tr. 444.)  Her symptoms included shaking.  (Tr. 444.)  Benson stated her medications helped and that she slept eight hours per night.  (Tr. 443.)  With regard to her activities of daily living, Benson spent her days cooking, cleaning, doing laundry, watching television, and caring for her pets.  (Tr. 444.)  She reported that she could perform chores independently "with more time." (Tr. 444.)  She was able to care for her personal hygiene adequately and drive short distances.  (Tr. 444.)  She was unable to shop and make purchases due to "physical and emotional issues," but reported that she did socialize with family and friends regularly.  (Tr. 444.)

Dr. Dubey diagnosed pain disorder with general medical and psychological factors, and anxiety disorder not otherwise specified.  (Tr. 446.)  He assigned her a GAF score of 60.  (Tr. 446.)  In addition, he opined that Benson's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was not impaired.  (Tr. 446.)  He reported that her mental ability to relate to others, including fellow workers and supervisors, was mildly impaired.  (Tr. 446.)  He further opined that her mental ability to withstand stress and pressure associated with day-to-day work activity was moderately impaired.  (Tr. 446.)  Finally, he concluded that her mental ability to understand and follow complex instructions and perform complex tasks was not impaired.  (Tr. 446.)

On August 24, 2010, state agency psychologist Richard Hamersma, Ph.D., reviewed Benson's medical records and completed a Mental RFC Assessment.  (Tr. 475-477.)  He concluded that she was moderately limited in her ability to (1) maintain attention and concentration for extended periods; (2) work in coordination with or proximity to others without

8

being distracted by them; and, (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 475-476.)  He opined that Benson "retain[ed] the capacity for understanding, remembering, and carrying out simple instructions and detailed ones but not complex ones.  She also retains the capacity for persistence, concentrating, and paying attention in the completion of simple tasks."  (Tr. 477.)  He felt that she is able to relate adequately to fellow coworkers, supervisors and the general public and to adapt to routine changes in a work setting.  (Tr. 477.)  Finally, he opined that her activities of daily living are not significantly impacted by any mental impairment.  (Tr. 477.)

***Hearing Testimony***

At the September 13, 2011 hearing, Benson testified as follows:

- She completed the ninth grade.  She later took vocational training to become licensed as a state tested nursing assistant ("STNA"). (Tr. 21.)

- She worked as a home health aide for about a year.  Her responsibilities included bathing, dressing and preparing dinner for her patients.  (Tr. 22, 46.)  She was required to lift patients in order to bathe them.  She worked approximately 30 hours per week.  She let her license lapse because she "began to care about [her patients] way too much" and "it was just too hard." (Tr. 22.)

- From 1994 to 2005, she worked as a janitor.  Her responsibilities included cleaning, buffing floors, mopping, sweeping, and dusting.  She was required to lift and carry up to 30 pounds.  (Tr. 22-23.)

- In 2004, she worked as a cashier.  She was required to lift and carry up to 15 pounds. (Tr. 23.)

- In late January 2008, she hurt her back while moving her bed.  (Tr. 41-42.)  She received treatment at a pain clinic, including MRIs, pain medication, and a series of epidural injections. (Tr. 23.)

- Since then her back pain has worsened.  (Tr. 39.)  It is a "sharp constant pain" that is "always there."  (Tr. 24.)  She also experiences throbbing, shooting pains down the right side of her leg, as well as numbness and tingling in her toes.  (Tr. 24.)  The pain used to be worse on her left side, but it is now worse on her right side. (Tr. 24.)

- She experiences muscle spasms on her right side a couple times per week.  They usually last approximately 15 minutes.  She tends to experience spasms after going up and down the steps too frequently or otherwise "overdoing it." (Tr. 25.)

- She has difficulty walking and going up stairs.  She can stand 30 minutes before needing to sit down or move around.  She can walk "a couple blocks" before needing to sit.  She can sit for 20 to 30 minutes before having to reposition

herself.  She can only go "a couple hours" before having to lie down.  Even if she had a job where she could change positions, she would not be able to work for a full eight hour day.  (Tr. 25-26.)

- She can lift and carry no more than 20 to 25 pounds.  She can bend down, but has trouble getting back up.  She has trouble with her right leg, "like I can't get it to function."  (Tr. 27-28.)

- She is not being treated for her back pain because she has no insurance and, therefore, cannot go to a specialist.  She received treatment in the past but it "didn't seem to help a lot."  Her back pain has worsened in past six months to a year. (Tr. 28-29.)  She uses a heating pad to try to relieve the pain. (Tr. 36.)

- She was diagnosed with irritable bowel syndrome ("IBS") in January 2010.  She experiences "extreme diarrhea," bloating, stomach pain, nausea, and constipation.  She has had four bouts of IBS in the last eight months.  They generally last a week, but have gone on as long as several weeks.  On a bad day, she is in the bathroom nine times in a five hour period.  She is not taking medication because she cannot afford it.  (Tr. 33-35.)

- She also experiences depression and anxiety.  She has "a hard time going anywhere alone" because of her anxiety issues and panic attacks.  She experiences panic attacks four or five times per week.  They are brought on by stress relating to her financial problems, health problems, and concerns about her daughter.  During a panic attack, she cannot breathe and is "hysterically crying, just like I'm just going to die."  Her attacks last about five minutes and, afterwards, she feels completely exhausted. (Tr. 29- 31.)

- She does not go outside her house unless she has to and, when she does, she needs someone to go with her.  When she was on "the right medication," she was able to go out on her own.  She was not taking medication at the time of the hearing but had made a doctor appointment for the end of the month. (Tr. 29-31.)

- She can drive when she is on medication.  She has not driven for the past month or so because of anxiety and difficulty concentrating.  She goes to the grocery store with her husband once a week, and to church two to three times per month.  She is able to "get housework accomplished, [but] not very well."  She does the dishes, goes up and down the stairs to do the laundry, cleans the toilet and sink, vacuums, and dusts.  She goes slow and has to rest often. Her husband "carries the heavy stuff" and helps with housework.  She sleeps poorly, generally only getting about four to five hours of sleep per night.  (Tr. 36-39.)

- Overall, she feels her pain is getting worse. During the hearing, her right leg was going numb.  She also felt a "very sharp pain" shooting down her right leg. (Tr. 39-40.)

ME, Paul Gatens, M.D., testified he had received Benson's complete medical records and provided written answers to the ALJ's interrogatories.  (Tr. 20.)  The ALJ indicated he was able to read Dr. Gatens' interrogatory responses (marked as Exhibit 17F) and had no further questions.  (Tr. 20.)  Benson's attorney was given the opportunity to question Dr. Gatens, but declined to do so.  (Tr. 20.)

10

The VE testified Benson had past relevant work as a (1) home health attendant (heavy, semi-skilled); (2) retail cashier (light, semi-skilled); and, (3) cleaner (medium, unskilled).  (Tr. 46-47.)  The ALJ then posed the following hypothetical:

> I'm going to ask you to assume an individual with the education and the past relevant work as previously been identified for the claimant.  Hypothetically, the person, the individual can occasionally lift 20 pounds; can frequently lift 10 pounds; push or pull to the same extent using hand or foot controls. The individual can stand or walk about six hours and sit about six hours in an eight-hour workday; cannot more than occasionally climb ladders, ropes or scaffolds; cannot more than frequently climb ramps or stairs; cannot more than frequently kneel or balance; cannot more than occasionally stoop, crouch or crawl; and, due to mental impairments, the individual can sustain attention to complete simple, repetitive tasks where production quotas are not critical and can adapt to routine changes in a simple work setting.

(Tr. 47-48.)  The VE testified such an individual could not perform Benson's past relevant work, but could perform other jobs such as office helper (light, unskilled), cleaner (light, unskilled), and table worker (sedentary, unskilled).  (Tr. 48.)

The ALJ then posed a second hypothetical that incorporated the same mental limitations as the first, but changed the physical functional limitations to those identified in Dr. Gatens' interrogatory responses, as set forth *supra*.[7]  (Tr. 49-50, 547-552.)  The VE testified that such a hypothetical individual could not perform Benson's past relevant work, but could perform other jobs at the sedentary level, including table worker, unskilled clerical, and assembler.  (Tr. 50-51.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

---

[7]  Specifically, the ALJ directed the VE to consider the physical functional limitations identified in the checkmarked (rather than hand-written) pages of Dr. Gatens' interrogatory responses, as set forth at Tr. 547-552. (Tr. 49-50.)

11

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[8]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Benson was insured on her alleged disability onset date, January 30, 2008, and remained insured through the date of the ALJ's decision.  (Tr. 102.)  Therefore, in order to be entitled to POD and DIB, Benson must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Benson established medically determinable, severe impairments, due to degenerative disc disease, arthritis, irritable bowel syndrome, pain disorder, anxiety disorder, panic disorder, and obsessive compulsive disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr.

---

[8]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

104- 106.)  Benson was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 106-110.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Benson was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Benson argues the ALJ erred by (1) failing to consider the combined effect of her physical and psychological pain on her ability to work; and (2) improperly assessing her credibility.

### Combined Effect of Physical and Psychological Pain

Benson first claims the ALJ erred by failing to consider the combined impact of her "physical and psychological pain generators."  (Doc. No. 16 at 2.)   She emphasizes she was diagnosed with "Pain Disorder with General Medical and Psychological Factors" (Tr. 446) and notes the ALJ recognized this disorder as a severe impairment.  (Tr. 104.)  She maintains that, despite this evidence of "multiple pain generators," the ALJ inappropriately weighed her physical and psychological pain separately.  Benson argues that, as a result, the ALJ failed to accurately assess the severity of her pain and improperly determined she was able to work. Indeed, Benson maintains that "[t]here was no evidence she could perform any work considering the combination of the psychological and physical pain components." (Doc. No. 16 at 15.)

The Commissioner argues that, although the ALJ discussed Benson's physical and

14

mental impairments separately, there is no evidence that he failed to consider their combined effect in determining she was not disabled.  Moreover, the Commissioner notes the ALJ gave Benson "considerable benefit of the doubt in formulating" the RFC and imposed functional limitations that adequately accounted for both her physical and mental impairments.  (Doc. No. 18 at 17-18.)

The Social Security Act requires the agency "to consider the combined effects of impairments that individually may be non-severe, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability."  *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988). *See* 20 C.F.R. § 404.1523.[9]  "Disability may be established if the claimant suffers from a number of medical problems, none of which alone may be sufficiently disabling to prevent the performance of substantial gainful activity, but which taken together have that result."  *Brubaker v. Comm'r of Soc. Sec*., 2011 WL 4368355 at * 7 (S.D. Ohio Aug. 4, 2011) (citing *Mowery v. Heckler*, 771 F.2d 966, 971 (6th Cir. 1985)).

The Sixth Circuit has found that an ALJ's individual discussion of multiple impairments does not imply that the ALJ failed to consider the effects of the impairments in combination when it is clear the ALJ considered the totality of the record.  *See Gooch v. Secretary of Health and Human Servs*., 833 F.2d 589, 592 (6th Cir. 1987) (finding that, although the decision discussed each element of the record individually, the ALJ did not fail to consider the combined effect of a claimant's impairments where he referred to a "combination of impairments" in deciding the claimant did not meet the listings; referred to the claimant's "impairments" as not being severe enough to preclude performance of his past relevant work; noted the decision was

---

[9]  20 C.F.R. § 404.1523 provides as follows: "In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520)."

made after careful consideration of the "entire record;" and, discussed all of the claimant's impairments in the decision).  "To require a more elaborate articulation of the ALJ's thought process would not be reasonable." *Id.  See also Loy v. Secretary of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a "combination of impairments" in finding that the plaintiff does not meet the listings"); *Balkema v. Comm'r of Soc. Sec.*, 2011 WL 2601479 at * 3-4 (W.D. Mich. May 31, 2011); *Reynolds v. Comm'r of Soc. Sec.*, 2012 WL 6855375 at * 5-6 (N.D. Ohio Dec. 6, 2012).

Here, the Court finds the ALJ properly considered the combined effect of Benson's physical and psychological pain.  At step two, the ALJ determined that Benson suffered from the severe impairments of degenerative disc disease, arthritis, IBS, pain disorder, anxiety disorder, panic disorder, and OCD.  (Tr. 104.)  He expressly noted that "the claimant's impairments are severe, *in combination if not singly*, . . . in that claimant is significantly affected in the ability to perform basic work activities." (Tr. 104) (emphasis added).  At step three, the ALJ found that Benson "does not have an impairment *or combination of impairments* that meets or medically equals the severity of one of the listed impairments."  (Tr. 105) (emphasis added).  At step four, the ALJ noted that he formulated the RFC "[a]fter careful consideration of the entire record." (Tr. 106.)  Although the decision does not discuss the objective medical evidence of record at this step, it does discuss the opinion evidence at length with regard to both Benson's physical and mental impairments.  (Tr. 107-108.)  In this context, the decision references Benson's back pain (and associated MRIs) and irritable bowel syndrome, as well as her pain disorder, anxiety disorder, and OCD diagnoses.  (Tr.  107-108.)  The ALJ then formulated the RFC to include functional limitations relating both Benson's physical and mental impairments, as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b): occasionally lifting twenty pounds, frequently lifting ten pounds, and pushing or pulling to the same extent.  The claimant is capable of standing or walking about five hours (one hour at a time); and sitting about seven hours (two hours at a time) in an eight-hour workday. The claimant is capable of no more than frequently bilaterally reaching,

16

handling, fingering, feeling, pushing or pulling; and occasionally bilaterally using foot controls.  The claimant is limited to no more than occasionally climbing ramps, stairs, ladders, ropes or scaffolds; and occasionally balancing, stooping, kneeling, crouching or crawling.  The claimant is to avoid more than occasional exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold or heat, and vibrations; in a workspace with no louder noise than heavy traffic.  The claimant is capable of sustaining attention to complete simple repetitive tasks where production quotas are not critical; and is capable of adapting to routine changes in a simple work setting.

(Tr. 106-107.)

In light of the above, the Court finds substantial evidence of record shows the ALJ adequately considered the combined impact of Benson's impairments, including her symptoms of physical and psychological pain.  Benson's first assignment of error is without merit.

### Credibility

Benson next argues the ALJ made only a "superficial finding of credibility" that did not meet the specificity requirement set forth in Social Security Ruling 96-7p.  Specifically, she maintains the decision "asserted only vague accusations of 'exaggeration' and 'inconsistent reporting' without any specifics regarding what was exaggerated or reported."  (Doc. No. 16 at 18.)  She also argues the ALJ improperly determined that she responded well to medication, maintaining that "it is not disputed she did better on medication, but it was not so effective, she was capable of work." *Id*.

The Commissioner argues the ALJ articulated a number of specific bases for his credibility finding, including that Benson's allegations of disabling pain and anxiety were not supported by either the treatment notes or the opinion evidence of record.  (Doc. No. 18 at 15.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is

17

pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.* Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[10] The ALJ need not analyze all seven factors, but should show that he

---

[10]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732-733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or

considered the relevant evidence. *See Cross,* 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406

F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ accepted that Benson's degenerative disc disease, arthritis, IBS, pain

disorder, anxiety disorder, panic disorder, and OCD constituted severe impairments.  (Tr. 104.)

He found Benson was "significantly affected in the ability to perform basic work activities," but

dismissed Benson's statements concerning the intensity, persistence, and limiting effects of her

impairments as not credible to the extent they were inconsistent with the RFC.  (Tr. 109.)  He

evaluated Benson's credibility as follows:

> The claimant's representative argued the claimant is not capable of maintaining
> an eight-hour per day, five days per week work schedule.  (Ex. 14E.)  However, at
> the very least, the preponderance of the evidence does not support the
> representative's claims. There is also evidence of an exaggeration of the
> claimant's limitations and symptoms that erode her credibility, including some
> inconsistent reporting of limitations and symptoms among reports given to the
> agency, evaluators and treating sources that diminish the reliability of the reports.
> (2E, 3E, 4E, 6E, 7E, 8E, 10E, 12E).  The opinions from all of the state agency
> examiners and medical reviewers state that the claimant is capable of light
> exertional work.  The evidence also indicates that the claimant does well on her
> medications, which undermines her allegations of disabling mental impairments.
> (Exs. 5F, 10F, 15F).  Therefore, the medical evidence of record fails to support
> more severe limitations than stated in the residual functional capacity.  Therefore,
> after careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not credible to
> the extent they are inconsistent with the above residual functional capacity
> assessment.  In terms of the claimant's alleged physical impairments, the
> undersigned limits the claimant to less than a full range of light work as set forth
> in the residual functional capacity above.  In terms of the claimant's alleged
> mental impairments, the undersigned finds the claimant is capable of sustaining
> attention to complete simple repetitive tasks where production quotas are not
> critical; and is capable of adapting to routine changes in a simple work setting.
>
> In sum, the above residual functional capacity assessment is supported by the
> objective medical evidence contained in the record.  Treatment notes in the record
> do not sustain the claimant's allegations of disabling pain.  (Exs. 1F, 2F, 3F, 4F,
> 5F, 6F, 13F, 14F, 15F, 16F).  The opinions of the state agency medical and
> psychological examiners and reviewers are based on the objective medical
> evidence of record, are consistent with the credible portion of the activities of
> daily living evidence and are not contradicted by any treating source.  More
> specifically, the medical findings do not support the existence of limitations
> greater than the above listed residual functional capacity. The claimant does

---

her credibility findings in terms of the factors set forth in the regulations, thereby permitting the
court to "trace the path of the ALJ's reasoning.")

experience some levels of pain and limitations, which the residual functional capacity above accounts for and describes.  The overall evidence indicates that while the claimant's condition restricts her ability to do work at all exertional levels, her condition does not preclude all work activity.

(Tr. 108-109.)

The Court finds the ALJ did not improperly assess Benson's credibility.  While the decision could have been more detailed, it does set forth a number of specific reasons for finding Benson to be less than fully credible.  Most notably, the ALJ points out that Benson's allegations of disabling pain and anxiety are not supported by the opinion evidence of record.  As the ALJ correctly notes, state agency physician Bacalla and ME Gatens both concluded Benson was capable of a limited range of light exertional work.  (Tr. 433-439, 544-552.)  With regard to Benson's mental impairments, state agency psychologists Dubey and Hamersma found Benson was no more than moderately impaired, and expressly found her capable of performing simple, routine tasks and adapting to routine changes in a work setting.  (Tr. 441-447, 475-477.)  The ALJ gave significant weight to these opinions and incorporated many of the limitations found by these physicians into the RFC.  Significantly, Benson raises no objection to the weight accorded to these opinions, nor does she direct this Court's attention to any treating physician opinion that assigns greater functional limitations than those set forth in the RFC.

In addition to the above, the ALJ also considered evidence indicating Benson had responded to conservative treatment and did well on her medications.  Specifically, in discussing the opinion evidence, the ALJ referenced treatment records indicating Benson had been treated conservatively for her back disorders and that her gastrointestinal symptoms were controlled with medication.  (Tr. 108.)  Moreover, with respect to her mental impairments, Benson herself testified that she did better when she was on the right medication.  (Tr. 31.)  Mental health treatment records from this time period (cited generally by the ALJ as Exhibits 5F, 10F and 15F) show Benson's depression and anxiety were generally controlled with medications, and that her occasionally increased symptoms were in response to situational stressors such as financial and family problems.  (Tr. 109, 363-375, 448-462, 523-524.)

Although the Court agrees it would have been better practice for the ALJ to provide more

20

detailed references to the objective medical evidence of record, the Court finds that, when viewed as a whole, the decision contains specific reasons for the finding on Benson's credibility, supported by evidence in the case record, and is sufficient to make clear the ALJ's reasoning, as required by SSR 96-7p.  Accordingly, Benson's second assignment of error is without merit.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED.

s/ Greg White
United States Magistrate Judge

Date: October 7, 2013

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**